**NONPRECEDENTIAL DISPOSITION**
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals
**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued June 8, 2016
Decided July 12, 2016

**Before**

WILLIAM J. BAUER, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

No. 15-2603

| | |
|---|---|
| ANA VERONICA JIMENEZ FERREIRA,<br>*Petitioner*, | Petition for Review of an Order of the<br>Board of Immigration Appeals. |
| *v.* | No. A200-892-195 |
| LORETTA E. LYNCH,<br>Attorney General of the United States,<br>*Respondent*. | |

**O R D E R**

Ana Veronica Jimenez Ferreira, a 40-year-old native and citizen of the Dominican Republic, applied for asylum and withholding of removal based on her membership in a social group that she describes as Dominican women in relationships they cannot leave. Jimenez testified in immigration court that she fled to the United States because the government of her home country would not protect her from her common-law husband, who had raped, beaten, and kidnapped her, and who continually stalked her and threatened to kill her and her two children. The immigration judge denied relief on the grounds that Jimenez was not credible and lacked corroborating evidence, and the Board of Immigration Appeals upheld the IJ's decision. The agency's adverse credibility determination was based largely on purported

inconsistencies between Jimenez's testimony at the removal hearing and her earlier statements to an asylum officer during a "credible-fear" interview. We conclude that the agency erred by (1) failing to address Jimenez's argument that the notes from the credible-fear interview are unreliable and therefore an improper basis for an adverse credibility finding and (2) ignoring material documentary evidence that corroborates Jimenez's testimony. Accordingly, we grant Jimenez's petition for review and remand for further proceedings.

Jimenez traveled from the Dominican Republic to the United States with the help of a human smuggler hired by her family. She left her home country in August 2010, first flying to Guatemala, then being smuggled north across Mexico on buses and trucks, and finally entering the United States on foot two weeks later in Laredo, Texas. Jimenez was immediately detained by border patrol and interviewed by an immigration officer. When asked whether she had any fear of returning to the Dominican Republic, she replied that she did not.

Three weeks into her detention, Jimenez told an asylum officer that she had come to the United States to escape her common-law husband, Ramon Holguin, a man who had beaten and raped her, and who (after Jimenez left him) stalked and threatened her. Jimenez, who speaks only Spanish, disclosed this information through a translator during a telephonic credible-fear interview—an interview meant to determine whether she could potentially be eligible for asylum or withholding of removal. The asylum officer who interviewed Jimenez concluded that "[t]here is a significant possibility that the assertions underlying [her] claim could be found credible in a full asylum or withholding of removal hearing."

Jimenez was released a few weeks later in November 2010, when bond was posted by her children's father—her first husband, Gerardo Marte, a Dominican citizen who now lives in Chicago and is a lawful permanent resident of the United States. In a motion filed before her removal hearing, Jimenez conceded that she was removable as an alien who lacked valid immigration documents, *see* 8 U.S.C. § 1182(a)(7)(A)(i)(I), but asserted that she sought asylum and withholding of removal. (She also sought protection under the Convention Against Torture but has abandoned that claim on petition for review.)

Jimenez was the only person to testify at her 2013 removal hearing. Speaking through an interpreter, she provided the following account: She was living with Holguin in Santo Domingo when in 2007, despite his objections, she took her children to a

Christmas party hosted by her ex-husband's family. When she returned from the party, Holguin beat and choked her in front of her son and threatened to kill her. He then forced her to the bedroom and raped her. Jimenez testified that after the attack she hid with her children at a friend's house and filed a complaint with the police. Holguin was arrested but released from jail after four days. (There is no indication in the record that he was ever prosecuted for the incident.) After his release from jail, Holguin went to Jimenez's office every day and told her that she "had to go back to him or else he was going to kill [her] and [her] children." To escape Holguin, Jimenez quit her job in Santo Domingo and moved back to her home town of Bonao (roughly 50 miles away), where she lived with her children and her mother.

About a year after the move, in early 2009, Holguin forced his way into Jimenez's apartment. He beat Jimenez and threatened to kill her, but bolted when her mother called the neighbors for help. Two months later, Jimenez said, she was walking outside when Holguin grabbed her, forced her into his car, drove her to an isolated part of the woods, and raped her. Jimenez testified that she didn't report the attack to the police because she didn't "believe in the police any more." She stated that in Santo Domingo, where she had reported Holguin's first assault, "when you go report something to the police, the person turns up dead later because they don't help anybody. They don't help the women."

After the mid-2009 kidnapping and sexual assault, Jimenez began receiving letters from Holguin in which he threatened to kill her and her children if she didn't come back to him. Believing that Holguin would eventually kill her if she stayed in the Dominican Republic, Jimenez fled to the United States. She explained that she left her children in the Dominican Republic because she couldn't bring them with her but said that she speaks to them "[e]very day" and that she plans to bring them to the United States if granted asylum. Since Jimenez left her home country, Holguin has been sending threatening letters to her mother, warning that if Jimenez doesn't return, "he's going to kill them all." Jimenez's mother has reported these letters to the police, but the police "don't do anything."

The government attorney questioned Jimenez about a discrepancy between the notes of her credible-fear interview—which indicated that the last time Holguin raped her was in her bedroom—and her testimony that he had last raped her in the woods. Jimenez responded that, when interviewed by the asylum officer over the phone, she "was detained" and "had just crossed the border," and that she "was confused and very nervous." When asked about other inconsistencies between her testimony and the

credible-fear interview—inconsistencies regarding the timing and location of events, and whether Holguin had ever hit her son—Jimenez answered that her statements must have been "misunderstood" or "misinterpreted." During her testimony, Jimenez made clear that she was ashamed to tell others of the sexual abuse she had experienced.

In support of her claims for relief, Jimenez submitted over 400 pages of documentary evidence, including several documents related to the 2007 sexual assault: the police complaint she had filed against Holguin; a doctor's report that noted bruises and scratches on Jimenez's body, as well as "visible signs and marks of a strangulation attempt" and a "torn inner and outer labia of the vagina, evidencing penetration by force or with resistance on the part of the victim"; and a psychologist's report that states that Jimenez "presents signs and symptoms of tension, worry, fear for her life and the lives of her family" and recommends "[t]hat she be referred immediately to group therapy" to "help her overcome the trauma." She also submitted an affidavit from her mother, accompanied by police complaints that the mother had filed against Holguin, affidavits from family members and friends, and numerous reports and articles documenting the epidemic of domestic violence and sexual assault against women in the Dominican Republic.

The IJ concluded that Jimenez was ineligible for asylum and withholding of removal because she was not credible and lacked evidence to corroborate her testimony. The IJ stated that the adverse credibility finding was based largely on "glaring inconsistencies" between Jimenez's testimony before the IJ and her statements at the credible-fear interview regarding the timing and location of events—for example, whether Holguin last raped her in January 2010 or several months later, and whether that rape occurred in the woods or in her bedroom—and whether Holguin had hit her son. The IJ rejected Jimenez's explanation that her statements during the credible-fear interview were misinterpreted and that she was confused and nervous during the interview. The IJ was especially troubled by the fact that "[b]oth the police complaint and her credible-fear interview indicate that [Jimenez] was not attacked by Holguin after she returned from the dinner party on Christmas Eve, as she testified at her hearing, but that the violence occurred before she was able to go to the party when Holguin blocked her path as she was leaving." Because the IJ found Jimenez not to be credible, the IJ concluded that she could meet her burden of proof under the REAL ID Act, 8 U.S.C. § 1158(b)(1)(B)(ii), only by producing "additional evidence that corroborates her claim of past persecution." The IJ then found her corroborating evidence insufficient to meet her burden of proof because the affidavit from her mother was "vague," the affidavits from Jimenez's other family members and friends were not based on personal knowledge,

and the country conditions reports and articles were "not particular to" Jimenez. Moreover, the IJ said, Jimenez offered no explanation why she had not submitted affidavits from her first husband or her then 12-year-old son.

On appeal to the Board, Jimenez argued, among other things, (1) that the notes from the credible-fear interview were unreliable and thus could not serve as a basis for an adverse credibility determination and (2) that the IJ erred by failing to consider material corroborating evidence, including the medical reports documenting the physical and psychological trauma she sustained as a result of the 2007 sexual assault, and the police complaints filed by her mother. The Board upheld the IJ's decision. With respect to the reliability of the notes of the credible-fear interview, the Board said only that "there are no indications that the notes from this interview are unreliable." And like the IJ, the Board said nothing about the medical reports or the police complaints filed by Jimenez's mother.

Before addressing the arguments Jimenez makes in this court, we pause to clarify two aspects of our review. First, the parties disagree over whether we should review only the Board's decision (the government's position) or the IJ's decision as supplemented by the Board's opinion (Jimenez's position). Jimenez's position is correct. Because the Board's opinion depends in part on the IJ's decision but does not "expressly adopt the IJ's analysis in its entirety"—instead supplementing the IJ's opinion with additional reasoning—we will review "the IJ's decision wherever the Board has not supplanted it with its own rationale" and review the Board's opinion "where the Board has spoken." *Sarhan v. Holder*, 658 F.3d 649, 653 (7th Cir. 2011); *see Zheng v. Holder*, 722 F.3d 986, 989 (7th Cir. 2013). Second, we do not address whether Jimenez has identified a valid social group for purposes of her asylum and withholding claims. Neither the IJ nor the Board questioned the propriety of Jimenez's proposed social group of Dominican women in relationships they cannot leave. Thus, for purposes of Jimenez's petition for review, we must treat the proposed social group as cognizable. *See R.R.D. v. Holder*, 746 F.3d 807, 809 (7th Cir. 2014); *Cece v. Holder*, 733 F.3d 662, 677 (7th Cir. 2013) (en banc).

We turn now to Jimenez's argument that the Board "erred as a matter of law" by failing to evaluate her argument that the IJ improperly depended on unreliable notes from the credible-fear interview in making an adverse credibility finding. Jimenez's contention that the notes are unreliable is based on *Moab v. Gonzales*, a decision in which this court listed "factors for consideration in determining the reliability of an asylum applicant's preliminary interview." 500 F.3d 656, 661 (7th Cir. 2007). Relying on *Moab*, Jimenez argues (as she did before the Board), that the notes from the credible-fear

interview are unreliable because (1) they are a summary and not a verbatim transcript, (2) the asylum officer conducting the interview didn't ask follow-up questions that would have clarified Jimenez's purportedly contradictory statements, (3) the notes indicate that Jimenez had difficulty understanding the questions asked through the interpreter, and (4) Jimenez was reluctant to reveal information to the asylum officer because of past negative experiences with the government in her home country.

We agree with Jimenez that the Board erred by rejecting her challenge to the adverse credibility determination without analysis and that this error warrants remand. In *Moab*, we concluded that the agency's credibility determination was not supported by substantial evidence because the record of the preliminary interview was "not a verbatim transcript," it was "unclear what, if any, follow-up questions were posed," and it was reasonable that the applicant "would not have wanted to mention his sexual orientation [during the interview] for fear that revealing this information could cause further persecution as it had in his home country." 500 F.3d at 661. The indicators that the notes of Jimenez's credible-fear interview are unreliable are almost *identical* to the signs of unreliability that were the basis for remand in *Moab*. Yet the Board made no mention of *Moab* or the criteria of reliability it set forth, instead concluding summarily that "there are no indications that the notes from [the credible-fear interview] are unreliable." This mistaken legal conclusion, combined with the Board's lack of *any* explanation about how it was reached, necessitates remand: "Remand is proper for additional analysis if the BIA 'has not adequately explained its result and it seems possible to us that the agency might be compelled to reach the opposite conclusion depending how it evaluates the record after remand.'" *Kone v. Holder*, 620 F.3d 760, 764 (7th Cir. 2010) (quoting *Gomes v. Gonzales*, 473 F.3d 746, 752 (7th Cir. 2007)); *see Gonzales v. Thomas*, 547 U.S. 183, 186–87 (2006).

The government defends the Board's decision by stating that remand is not necessary because "there are other indicia of reliability"—for example, the presence of an interpreter and Jimenez's telling the asylum officer that she understood the questions—and thus "the asylum officer's summary was sufficiently reliable to support an adverse credibility determination." We are not persuaded by the government's contention that the notes are reliable, especially given the pre-printed disclaimer accompanying the worksheet bearing the notes. That disclaimer makes clear that the credible-fear interview is not meant to be a detailed account of the events supporting an applicant's asylum claim:

> The following notes are not a verbatim transcript of this interview. These notes are recorded to assist the individual officer in making a credible fear determination and the supervisory asylum officer in reviewing the determination. There may be areas of the individual's claim that were not explored or documented for purposes of this threshold screening.

Regardless, the government's reliance on "other indicia of reliability" must be rejected because it is not based on the Board's rationale and therefore violates the *Chenery* doctrine. *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) (holding that agency may not defend administrative decision on new ground not set forth in its original decision); *Lara v. Lynch*, 789 F.3d 800, 805–06 (7th Cir. 2015); *R.R.D.*, 746 F.3d at 809–10.

The government also attempts to excuse the Board's failure to address Jimenez's evidence and legal arguments on the basis that the Board "is not required to write 'an exegesis' on every contention raised by the applicant." But this general principle does not excuse the Board from having to consider an alien's arguments "and announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted.'" *Solis-Chavez v. Holder*, 662 F.3d 462, 469 (7th Cir. 2011) (quoting *Iglesias v. Mukasey*, 540 F.3d 528, 531 (7th Cir. 2008)). Thus, we have frequently remanded cases where the agency's "failure to discuss potentially meritorious arguments or evidence"—here, arguments and evidence regarding the reliability of the interview notes that were used in making an adverse credibility finding—"calls into question whether it adequately considered these arguments." *Kebe v. Gonzales*, 473 F.3d 855, 857 (7th Cir. 2007).

Jimenez next argues that the conclusion by the IJ and the Board that she lacks corroborating evidence to meet her burden of proof is not supported by substantial evidence because both the IJ and the Board improperly overlooked documents that corroborate her testimony: the police complaints filed by her mother as well as her medical and psychological evaluations from December 2007. Again, we agree with Jimenez that the agency's silence with respect to this evidence is an error that warrants remand: "The Board must analyze rather than ignore material evidence." *R.R.D.*, 746 F.3d at 810; *see Escobar v. Holder*, 657 F.3d 537, 544 (7th Cir. 2011). We are especially troubled by the agency's failure to consider the medical report; this is a pronounced error because that report—which was used to obtain an arrest warrant for Holguin—documents the injuries that Jimenez suffered as a result of the 2007 attack and thus strongly corroborates Jimenez's testimony that Holguin beat, choked, and raped her.

The government's attorney conceded at oral argument that the IJ and the Board did not mention the medical report but maintained that the agency's silence is of no moment because the rape is "not sufficient to establish her eligibility for asylum as a woman who is in a relationship she cannot leave." This argument runs afoul of the *Chenery* doctrine, as the government again seeks to defend the agency's decision on a ground not articulated by the agency itself. Notwithstanding the *Chenery* violation, the government's argument is nonsensical. There is no legal support for the government's belief that the Board must consider only evidence that, standing alone, establishes an alien's eligibility for relief from removal. Rather, the Board must analyze *material* evidence. *R.R.D.*, 746 F.3d at 810; *Escobar*, 657 F.3d at 544. Here, there is no doubt that the evidence ignored by the Board and the IJ is material: The Board stated that absent credible testimony, Jimenez had "failed to establish her burden of showing past persecution or a well-founded fear of persecution," yet the medical report documenting that Jimenez had been raped is strong evidence of past persecution. *See Sankoh v. Mukasey*, 539 F.3d 456, 471 (7th Cir. 2008).

We have said enough to show why remand is necessary, but we wish to make a final point about the agency's credibility assessment. Although the REAL ID Act, 8 U.S.C. § 1158(b)(1)(B)(iii), permits immigration judges to "base an adverse credibility finding on any inconsistency, whether it goes to the heart of the applicant's claim or not," *Georgieva v. Holder*, 751 F.3d 514, 520 n.2 (7th Cir. 2014), inconsistencies cited by immigration judges "should not be trivial," *Tawuo v. Lynch*, 799 F.3d 725, 727 (7th Cir. 2015). Here, the IJ made much of a discrepancy in Jimenez's statements over the precise time that she was raped and beaten by Holguin in December 2007. We fail to see how this discrepancy is anything but trivial, given that Jimenez has consistently maintained that Holguin raped her on Christmas Eve and that the medical report strongly backs her claim.

Because the agency erred both by failing to adequately address Jimenez's argument that the notes from the credible-fear interview are unreliable and by ignoring material evidence that supports her claims for asylum and withholding of removal, we GRANT the petition for review and REMAND the case to the Board for further proceedings.