In the

# United States Court of Appeals
## For the Seventh Circuit

No. 22-1973

ULANBEK KADYR UULU,

*Petitioner,*

*v.*

MERRICK B. GARLAND, Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order
of the Board of Immigration Appeals.
No. A206-745-949.

ARGUED FEBRUARY 14, 2023 — DECIDED SEPTEMBER 1, 2023

Before ROVNER, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges.*

JACKSON-AKIWUMI, *Circuit Judge.* Ulanbek Kadyr Uulu, a citizen of Kyrgyzstan, entered the United States on a tourist visa. After his visa expired, he made an affirmative request for asylum alleging that he faced persecution at home for protesting a government mining rights deal. His asylum request was denied, and the case was referred to immigration court

where the judge, and later the Board of Immigration Appeals, likewise rejected his asylum bid and set him on the course for voluntary removal. He now petitions for our review. We share some of Uulu's concerns about the immigration judge's review of his corroborating evidence on the events that led him to flee Kyrgyzstan. But at the same time, Uulu's account of those events contains too many inconsistencies to upset the immigration judge's conclusion that he was not credible. Those inconsistencies, coupled with our deferential standard of review, lead us to deny Uulu's petition.

**I**

We sketch the following facts largely based on the account Uulu's counsel has presented to us; we note any inconsistencies in that account later in our discussion. Uulu, now in his mid-forties, is from the Kyrgyz capital of Bishkek, where he lived with his wife and two teenage children. He became more involved in politics in 2010, when he joined Respublika, one of several opposition parties in Kyrgyzstan. In 2012, he saw a news report on a deal Kyrgyzstan officials signed giving Kumtor, a Canadian company, the rights to a gold mine. He believed the deal was a corrupt giveaway of national resources to a foreign company.

On April 24, 2013, Uulu attended a peaceful protest against the Kumtor deal. Police fired tear gas at the crowd and attacked protesters, including Uulu. The police took Uulu to a police station where they hit him with a filled bottle and placed cellophane over his head, causing him to lose consciousness. Uulu testified that he was detained for five to six hours and that a chemical in the room, likely chlorine, made

him dizzy. Before releasing Uulu, one of the officers asked him to sign a document stating he could not leave the country.

The morning after Uulu's release, on April 25, 2013, the police visited him and brought him back to the station. There, they asked him to admit guilt, put a bag over his head, and detained him without food until around nine o'clock at night. He was told to come back the next day. Uulu took a taxi home and when he got out, four unknown men asked who he was and beat him until he was unconscious. He woke up in the hospital. He later called the police and said he could not appear the next day but would return after recovering from his injuries. He never returned to the police station and, roughly two months later, on June 20, 2013, he left for the United States on a tourist visa. Uulu says that while he was in the United States, the Kyrgyz government found him guilty of "organizing mass riots" and sentenced him in absentia to five years in prison.

In 2014, Uulu made an affirmative asylum request that U.S. Citizenship and Immigration Services rejected. An asylum officer then classified him as removable under 8 U.S.C. § 1227(a)(1)(B) for violating the terms of his visa, and the Department of Homeland Security referred his case to immigration court in 2015.

In 2018, the immigration court held a hearing on Uulu's asylum application. As part of the hearing, Uulu testified and presented corroborating letters from his wife, relatives, neighbors, and lawyer in Kyrgyzstan. He also supplied records including a medical report documenting injuries from one of his beatings and documentation of a criminal proceeding in Kyrgyzstan. After approximately one month, the immigration

judge denied the application and granted the government's request for Uulu's voluntary removal.

The immigration judge ruled that Uulu made shifting statements about key events in his asylum application, at his asylum interview, and during his hearing testimony. These key events included whether police harmed him when he was detained on April 24, how long he was detained, whether he returned to the police station on April 26 as requested, and where he was attacked by unknown individuals. The immigration judge found that smaller details like the use of chlorine by the police had also shifted.

The immigration judge decided to put less weight on the corroborating statements from family and neighbors because they were interested parties who were not available for cross examination. Additionally, the judge noted, the statement from Uulu's wife contradicted his claim of detention and torture on April 24, and the medical report corroborated only Uulu's April 25 injuries, which were inflicted by unknown individuals not obviously associated with state actors. The judge placed little weight on the documents showing the "mass riots" criminal charge levied against Uulu—these included a "search and arrest warrant" and papers from the subsequent judicial proceeding—because the immigration court could not verify the documents.

Uulu appealed to the Board of Immigration Appeals, which affirmed the immigration judge without further opinion.

**II**

In this petition for review, Uulu argues the immigration judge's decision was based on "trivial" inconsistencies in his accounts of who harmed him and when.

Because the Board of Immigration Appeals summarily adopted the decision of the immigration judge, we review the factual findings of the immigration judge as if the Board made them. *Boci v. Gonzales*, 473 F.3d 762, 765–66 (7th Cir. 2007). We review those factual findings—including the immigration judge's credibility findings—with deference and uphold them "so long as they have the support of substantial evidence." *Cojocari v. Sessions*, 863 F.3d 616, 621 (7th Cir. 2017) (quoting *Krishnapillai v. Holder*, 563 F.3d 606, 609, 615 (7th Cir. 2009)).

For Uulu to qualify for asylum, he must prove he is a qualifying refugee—that he cannot or will not return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1158(b)(1)(A) & § 1101(1)(42)(A). Persecution can include "punishment or the infliction of harm for political, religious, or other reasons that this country does not recognize as legitimate." *Cruz-Martinez v. Sessions*, 885 F.3d 460, 463 (7th Cir. 2018) (quoting *Pathmakanthan v. Holder*, 612 F.3d 618, 622 (7th Cir. 2010)).

An applicant has the burden of showing they are a qualifying refugee, and their application can be sustained based on testimony alone if the court determines it is "credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(l)(B)(i)-(ii).

An immigration judge may base an adverse credibility finding on falsehoods or inconsistencies in testimony, even if the inconsistencies do not go to the heart of the applicant's claim. *Cojocari v. Sessions*, 863 F.3d at 620. Still, an immigration judge must distinguish between material and immaterial inconsistencies. We have previously reversed denials of asylum when inconsistencies were minor, concerned "irrelevant details" in the context of an applicant's "broader claim of persecution," or when the immigration judge failed to consider "reasonable explanations offered." *Id.*

## A

Uulu recounted his experience in Kyrgyzstan at three key points: (1) his asylum application; (2) his asylum interview; and (3) the immigration court hearing. The inconsistencies in Uulu's account are serious and go directly to the extent of his persecution and the threat he could face if he were sent back home. He consistently testified that he attended a political protest against the mine deal on April 24. But, he did not mention until the immigration court hearing that he was tortured by police during his interrogation that day.

While Uulu's account of what happened on April 25 is relatively consistent, the area where his story shifts is key to our analysis. In his asylum application and asylum interview, he said he was taken by militia to a station in the morning and when he left the station in the evening, he was beaten into unconsciousness by unknown individuals and ended up in a hospital. Critically, in those accounts, he did not mention any attack by the government officials who detained him earlier that day. However, at his hearing, he said police tortured him throughout the day at the station and he took a cab home once

released in the evening. In seeking asylum, Uulu needs to show that his fear of persecution is "attributable to the 'government or to a nongovernmental entity that the government is unable or unwilling to control,'" so the question of whether government officials ever tortured him on April 25 is important to his application. *Cruz-Martinez*, 885 F.3d at 463 (quoting *Almutairi v. Holder*, 722 F.3d 996, 1002 (7th Cir. 2013)). Additionally, but less important, in the account he gave at his hearing, he was attacked by the unknown individuals near his home, not the station. He then woke up from the beating and went to the hospital.

Uulu's statements about the next day, April 26, varied as well. According to his asylum application, he was in the hospital. In his interview, he said he was taken to the police station and held for eight hours. At his hearing, he said the police asked him to come back on April 26, but he outwitted them by saying he was sick and never returning to the station.

Uulu argues these inconsistencies are akin to those in *Ferreira v. Lynch*, where we held that "trivial" inconsistencies in an applicant's account are not enough to sustain an adverse credibility finding. 831 F.3d 803, 810–11 (7th Cir. 2016). In *Ferreira*, the immigration judge found the applicant not credible because she consistently alleged being raped by her common law husband, but her accounts of when and where the assault happened differed between her credible fear interview and her hearing testimony. *Id.* at 807–08. The immigration judge also relied on inconsistencies about whether the husband had hit her child. *Id.* at 808. We disagreed with the immigration judge in that case, pointing to medical records corroborating the applicant's accounts of abuse and rape, and consistencies

in her account of the timing of one of the assaults. *Id.* at 810–11.

*Ferreira* cannot save Uulu's claim. Much of our analysis in *Ferreira* was based on signs of unreliability in the asylum officer's notes from the applicant's credible fear interview. The indica of unreliability plaguing the credible fear interview meant inconsistencies between the interview and later accounts by the applicant were less salient. *See id.* at 809 ("We are not persuaded by the government's contention that the notes are reliable, especially given the pre-printed disclaimer … [making] clear that the credible-fear interview is not meant to be a detailed account of the events supporting an applicant's asylum claim."). In Uulu's case, there are no similar challenges to the reliability of the asylum officer's notes. We defer to the immigration judge's credibility determinations and only overturn them "in extraordinary circumstances" not present here. *Dai v. Garland*, 24 F.4th 628, 635 (7th Cir. 2022) (quoting *Omowole v. Garland*, 6 F.4th 734, 742 (7th Cir. 2021)).

Uulu's counsel also asserts that the immigration judge's adverse credibility finding fails to acknowledge the difficulty he experienced while trying to remember events that occurred years earlier. There *can* be limits to a person's recollection, but there is a key problem with the assertion as applied to Uulu's case: he does not develop this argument in his petition for review. He cites a single case and then alleges, without a record citation, that he explained at the immigration hearing that "it was only now years later that he is able to fully recollect everything that took place and talk about it because of the trauma that he had suffered." It is not our duty to hunt for the proof of this statement in the record. *See Long v. Teachers' Ret. Sys. of Illinois*, 585 F.3d 344, 349 (7th Cir. 2009) ("To

present an argument on appeal, a party must develop its position by providing citation to the relevant portions of the record and supporting authority." (citing Fed. R. App. P. 28(a)(9)(A))). We did locate one instance in the removal hearing where Uulu was asked about a beating on April 24 and responded that he was "in a state of stress" at his asylum interview.

Uulu's scant assertion about trauma and memory in his petition for review, and the lack of record evidence supporting that assertion, are a far cry from the facts that influenced the outcome in cases like *Ferreira*. *See also INS v. Phinpathya*, 464 U.S. 183, 188–89 n.6 (1984) (stating counsel's argument—in that case an argument about mootness—was meritless because the record did not support it). What makes Uulu's perfunctory argument before us so puzzling is that Uulu did attempt to ground the argument in the record before the BIA. In his BIA briefs, Uulu (1) pointed to difficulties in translating from Kyrgyz to English (without making any specific claims of inaccuracy) and (2) contended that the inconsistency between a beating outside the police station or near his home was the result of traumatic stress. But these two observations—which Uulu did not mention in his petition to us—cannot overcome the inconsistent recounting of key points in his asylum claim, nor do they suggest, as Uulu attempts to do with his heavy reliance on *Ferreira*, that the asylum interview was too unreliable for inconsistencies between it and later hearings to matter.

**B**

When "faced with an adverse credibility finding based on material inconsistencies or omissions," a petitioner can

counter that finding by pointing to corroborating evidence in the record. *Torres v. Mukasey*, 551 F.3d 616, 633 (7th Cir. 2008). Uulu has attempted to do just that by highlighting the statements from his wife, his brother, a fellow protester, and his lawyer in Kyrgyzstan, plus documentation like the medical report from one of his attacks.

We share some of Uulu's concerns about the way the immigration judge weighed this corroborating evidence. For example, the judge rejected letters from Uulu's Kyrgyz attorney and the fellow protester in part because the judge had already found Uulu not credible. The judge pointed to the First Circuit's decision in *Yong Xiu Lin v. Holder*, 754 F.3d 9 (1st Cir. 2014), as support for this outcome. However, the First Circuit's law on this aspect of credibility findings is narrower than the judge supposed: the *Lin* court noted credibility findings "can inform the evidentiary weight" ascribed to "unauthenticated documents in a later, related proceeding." 754 F.3d 9 at 15–16. The petitioner in that case was on her second motion to reopen removal proceedings, seven years after the denial of the first motion and twelve years after she was originally ordered removed. *Id.* at 10–11. The same was true in *Le Bin Zhu v. Holder*, 622 F.3d 87, 90, 92 (1st Cir. 2010), which held that an immigration judge's initial adverse credibility finding, affirmed by the BIA, supported the BIA's decision over a year later, on a motion to reopen, to accord limited evidentiary value to an unauthenticated document. Uulu's case is factually distinct from cases like *Lin* and *Zhu*: He is still in the same proceeding, so the First Circuit decisions do not compel the immigration judge to give diminished weight to the letters from his attorney and fellow protestor because the judge had already found Uulu not credible.

Nevertheless, Uulu's supporting documents introduce discrepancies that further weaken his claim. The statements from his wife and brother both say he went to a protest and then came home on April 24, but they do not mention Uulu being arrested or injured; only the fellow protester mentions torture and attempted extortion on April 24. Uulu's wife and brother agree on the timeline of April 25: he was arrested by the government in the morning, released in the evening, and then beaten up by unknown individuals and left in a ditch. However, neither account mentions Uulu being detained the next day. The accounts of his neighbors differ slightly too: three neighbors say Uulu was threatened by police on April 24, while two neighbors say he was threatened two days later, on April 26. Uulu's wife references similar intimidation, but several days after April 26.

The medical record does corroborate an attack by unknown individuals on April 25, just as Uulu consistently testified, and just as his wife and brother described. But as we have explained, in seeking asylum, an applicant needs to show that their fear of persecution is "attributable to the 'government or to a nongovernmental entity that the government is unable or unwilling to control.'" *Cruz-Martinez*, 885 F.3d at 463 (quoting *Almutairi v. Holder*, 722 F.3d 996, 1002 (7th Cir. 2013)). Uulu's evidence does not rise to that level: the accounts of action taken directly by government officials carry the greatest weight and have the most inconsistencies, while the attack he has substantiated the most was by unknown actors with no known relationship to the government. *See Jonaitiene v. Holder*, 660 F.3d 267, 270 (7th Cir. 2011) ("persecution … does not encompass purely private actions.")

## III

Uulu's petition is beset with conflicting information about important elements of his persecution claim, and his supporting documents do not resolve the bulk of these conflicts. For these reasons, we decline to overturn the immigration judge's credibility finding, and by extension, **DENY** the petition for review.