In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-3941

VLADIMIR COJOCARI & VERONICA MORARU,

*Petitioners*,

*v.*

JEFFERSON B. SESSIONS III, Attorney General of the United States,

*Respondent*.

Petition for Review of an Order
of the Board of Immigration Appeals.
Nos. A088-431-779, A088-431-780.

ARGUED MAY 17, 2017 — DECIDED JULY 11, 2017

Before WOOD, *Chief Judge*, and MANION and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Vladimir Cojocari, a citizen of Moldova, seeks asylum, withholding of removal, and protection under the United Nations Convention Against Torture. His wife Veronica Moraru is a derivative applicant for this relief. The immigration judge denied the application and or-

dered the couple removed, and the Board of Immigration Appeals dismissed their appeal. The couple has petitioned for review in this court under 8 U.S.C. § 1252.

We grant their petition. The Board's decision rested on the immigration judge's adverse credibility finding. Judicial review of credibility determinations is deferential, and reviewing courts rarely overturn credibility findings by agency adjudicators. Such findings are not beyond judicial review, however. This is one of those relatively unusual cases where the agency's credibility finding is arbitrary and capricious. As we detail below, the immigration judge made mountains out of molehills, fashioned inconsistencies from whole cloth, and held Cojocari's efforts to obtain corroborating documents against him. We remand for a fresh assessment of Cojocari's credibility, preferably by a different immigration judge.

I.   *Factual and Procedural Background*

   A.   *Cojocari's Experience with Political Persecution*

Vladimir Cojocari and Veronica Moraru are citizens of Moldova, a former Soviet republic that was under Communist control as recently as 2009. According to the U.S. Department of State, corruption is rampant in Moldova, and torture by police and prison officials has been widely reported.

Cojocari's political troubles began in 2007 while he was a student at the Academy of Economic Studies in Chişinău, Moldova's capital city. Cojocari became involved with the Alianţă Moldova Noastră (AMN), which is translated as "Our Moldova Alliance." AMN was a liberal democratic group that opposed government corruption and backed the mayoral campaign of a reform candidate.

Cojocari claims that Moldovan police and other unknown parties persecuted him because of his political activism. He says that he was arrested and beaten on several occasions between June 2007, around the time of the Chişinău mayoral election, and October 2009, shortly before he and Veronica traveled to the United States. We describe these incidents below, drawing from the immigration judge's decision as well as the administrative record. The judge concluded that Cojocari's testimony was not credible overall, with specific exceptions. Nevertheless, the government has introduced no evidence actually rebutting Cojocari's claims concerning his persecution. Cojocari, conversely, has introduced substantial documentary evidence—including hospital and arrest records—that corroborates his testimony about these incidents.

Cojocari says that he was first arrested on June 23, 2007. He testified that authorities transported him to the central police station in Chişinău and interrogated him about his political activities. Police also ordered him to sign a document agreeing to become a police informant and not to cooperate with opposition parties. He refused. Cojocari was held overnight and repeatedly beaten. The following day, he was released from custody and promptly checked himself into a hospital. According to hospital records that Cojocari submitted, he was diagnosed with blunt, closed-chest trauma and contusions and abrasions, injuries consistent with his report of the beatings.

Cojocari was next arrested on September 28, 2007. He was again held overnight. He testified that on this occasion, he was not beaten but police threatened him and again pressured him to sign some documents. Again he refused. Police then

warned him that he "took the wrong decision" and that they would "see each other again in the near future."

Over eighteen months passed without further incident. In early April 2009, Cojocari joined other AMN members in a protest over recent parliamentary elections. The protest started peacefully but quickly turned violent. Cojocari testified that he did not participate in any violence. He was nevertheless arrested and "sentenced" to a week of detention, during which time he said he was beaten again. Cojocari was released after nine days. He checked himself into a hospital. Medical records show he was diagnosed with cerebral trauma, a concussion, and various wounds and abrasions, again consistent with his report of beatings. Following this detention, Cojocari hired a lawyer and filed a complaint with the general prosecutor's office in Chişinău. He also sought help at both AMN and Democratic Party headquarters, but nobody was willing to help him. Cojocari decided to lie low for a while. He and his wife Veronica moved to her parents' home in the riverside village of Gura Galbenei, about thirty miles outside the capital city.

On August 28, 2009, Cojocari was detained yet again while leaving the Academy of Economic Studies back in Chişinău. (His reasons for being present at the academy that day are somewhat murky, as discussed below.) According to Cojocari, police interrogated him and a detective told him the complaint he had filed with the prosecutor had "no value." Cojocari says he was beaten and held in a cell for three days without food or water. After he was released, Cojocari again went to the hospital, where records show he was diagnosed with a closed fracture in his arm and multiple bruises. Veronica was pregnant at the time. She met Cojocari at the hospital and told

him that government officials had visited their home and harassed her. Veronica became so distressed as they spoke that she became physically ill and ultimately suffered a miscarriage. At that point, Cojocari and Veronica decided to flee Moldova. They applied for visas so they could travel to the United States.

A final incident occurred on October 25, 2009, shortly before the couple were scheduled to depart for the United States. Cojocari testified that he was "kidnapped" by a group of unknown assailants who told him that people who "ask for too much justice are viewed as unwelcome elements in Moldovan society." The men beat Cojocari until he blacked out, then left him bruised and battered in a field. Following the attack, Cojocari received medical treatment for more than a week. Despite that setback, Cojocari and Veronica departed Moldova as scheduled. They arrived in Chicago on November 6, 2009.

B. *History of the Case*

In May 2010, well in advance of the one-year filing deadline, the couple applied for asylum pursuant to 8 U.S.C. § 1158(b)(1)(A). They also requested withholding of removal under 8 U.S.C. § 1231(b)(3)(A), and protection under the United Nations Convention Against Torture ("CAT") as implemented through 8 C.F.R. §§ 1208.16 and 1208.18.

An asylum officer referred the couple's case to an immigration judge. The government then began removal proceedings against the couple under 8 U.S.C. § 1227(a)(1)(B) for overstaying their visas. The couple conceded the charge of removability but contended that Cojocari was eligible for asylum

and related relief because he would likely face political persecution and torture upon his return to Moldova.

Cojocari testified at a series of immigration court hearings held on November 26, 2013; September 23, 2014; and November 5, 2014. He supported his testimony with extensive documentation, including numerous hospital and arrest records and an AMN membership card (proof of his political activity, which the immigration judge credited). Cojocari also offered a report and testimony by Professor Igor Kotler, an historian whom the immigration judge recognized as an expert on country conditions in Moldova.

The immigration judge denied Cojocari's application for asylum, withholding of removal, and protection under the CAT, and she ordered Cojocari and Veronica removed to Moldova. In reaching her decision, the judge found that (1) Cojocari's testimony was not credible, and (2) he provided insufficient corroborating evidence to "meet his burden of proof to show that the central aspects of his claim are true." The Board of Immigration Appeals dismissed the couple's appeal in a decision generally agreeing with the immigration judge's reasoning. The couple then sought review in this court.

II.  *Analysis*

   A.  *Legal Framework*

      1.  *The REAL ID Act*

The Secretary of Homeland Security or the Attorney General may grant asylum to an alien who qualifies as a "refugee." 8 U.S.C. § 1158(b)(1)(A). Refugees are people who are unable or unwilling to return to their native countries because of "persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular

social group," or—as relevant here—"political opinion." 8 U.S.C. § 1101(a)(42)(A).[1]

The burden of proof rests on the applicant to establish that he or she is a qualifying refugee. § 1158(b)(1)(B)(i). In some cases, the applicant may carry the burden through testimony alone, but only if the immigration judge finds the testimony credible and persuasive. § 1158(b)(1)(B)(ii).

Under the REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231, the immigration judge may base an adverse credibility finding on any inconsistencies or falsehoods in the applicant's testimony, without regard to whether such inconsistencies or falsehoods go to the "heart of the applicant's claim." § 1158(b)(1)(B)(iii). Even so, the judge must still "distinguish between inconsistencies … that are material and those that are not." *Krishnapillai v. Holder*, 563 F.3d 606, 617 (7th Cir. 2009); see also *Hassan v. Holder*, 571 F.3d 631, 637 (7th Cir. 2009) ("Although the REAL ID Act requires a highly deferential review of credibility findings, Immigration Judges may not rely on inconsistencies that are completely trivial, or that result from a misunderstanding or mischaracterization of the applicant's

---

[1] As noted above, in addition to applying for asylum Cojocari sought withholding of removal and protection under the CAT. The requirements for these forms of relief are more demanding than for asylum. For withholding of removal, the applicant must show a clear probability of persecution. The CAT requires proof that the applicant would more likely than not face torture if deported. See *Shmyhelskyy v. Gonzales*, 477 F.3d 474, 481–82 (7th Cir. 2007). The immigration judge relied primarily on her adverse credibility determination in rejecting each of Cojocari's theories of relief, and the parties focus on that adverse determination in their briefing here. Because we are remanding this case to the agency for a fresh look at Cojocari's credibility, the agency should consider on remand whether Cojocari is entitled to relief under any of the three theories he has advanced.

testimony.") (citations omitted); accord, *Ferreira v. Lynch*, 831 F.3d 803, 811 (7th Cir. 2016); *Chun Sui Yuan v. Lynch*, 827 F.3d 648, 653 (7th Cir. 2016); *Tawuo v. Lynch*, 799 F.3d 725, 727 (7th Cir. 2015). "We … have reversed when the discrepancies were minor, when they concerned irrelevant details in light of the alien's broader claim of persecution, or when the [immigration judge] failed to consider the alien's reasonable explanations offered for a discrepancy … ." *Tarraf v. Gonzales*, 495 F.3d 525, 532 (7th Cir. 2007) (citations omitted) (evaluating petition under pre–REAL ID framework).

Pursuant to the REAL ID Act, the immigration judge may require the applicant to submit corroborative evidence even if the judge finds the applicant credible. *Silais v. Sessions*, 855 F.3d 736, 745 (7th Cir. 2017); *Rapheal v. Mukasey*, 533 F.3d 521, 527 (7th Cir. 2008). The applicant must provide supporting evidence upon request "unless the applicant does not have the evidence and cannot reasonably obtain the evidence." § 1158(b)(1)(B)(ii); cf. *Mitondo v. Mukasey*, 523 F.3d 784, 789 (7th Cir. 2008) ("When documentary proof one way or the other is unavailable, the agency must use the details of an alien's story to make an evaluation of its truth.").

2. *Standard and Scope of Review*

Where the Board of Immigration Appeals agrees with the immigration judge's decision but supplements that decision with its own analysis, as it did here, we review both the underlying decision and the Board's additional reasoning. *Santashbekov v. Lynch*, 834 F.3d 836, 839 (7th Cir. 2016); *Darinchuluun v. Lynch*, 804 F.3d 1208, 1214 (7th Cir. 2015); *Yi Xian Chen v. Holder*, 705 F.3d 624, 628 (7th Cir. 2013); *Abraham v.*

*Holder*, 647 F.3d 626, 632 (7th Cir. 2011); *Milanouic v. Holder*, 591 F.3d 566, 570 (7th Cir. 2010).[2]

We review findings of fact, including credibility determinations, deferentially, upholding them "so long as they have the support of substantial evidence." *Krishnapillai*, 563 F.3d at 609, 615 (denying review). "Under the substantial evidence test, we must uphold the [immigration judge's] findings if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Abraham*, 647 F.3d at 628, 632 (dismissing in part and denying review in part); accord, *Silais*, 855 F.3d at 738, 742 (denying review).

---

[2] Citing *Garrovillas v. INS*, 156 F.3d 1010 (9th Cir. 1998), Cojocari suggests that where the Board conducts a *de novo* review, our review is limited to the Board's decision "except to the extent that the Immigration Judge's opinion is expressly adopted." Here, the Board did not expressly adopt the immigration judge's entire opinion (though it did expressly adopt the reasoning supporting her conclusion that Cojocari's documentary evidence was insufficient). However, the Board also did not conduct a *de novo* review of the record. Instead, the Board reviewed the immigration judge's findings for clear error, approved her adverse credibility determination, and then highlighted several aspects of her decision that supported her determination. At the same time, the Board also acknowledged in a footnote two findings that did not support the judge's credibility determination. Under these circumstances, it is proper for us to consider not only those aspects of the immigration judge's decision that the Board chose to emphasize but also those findings that the Board implicitly endorsed. Cf. *Mei Dan Liu v. Ashcroft*, 380 F.3d 307, 311–12 (7th Cir. 2004) (reviewing the Board's decision alone where the decision rested on grounds alternative to those on which the immigration judge relied and where the Board "conducted its own analysis of the evidence and declined to adopt, affirm, or even address the adverse credibility determination that was the basis of the [immigration judge's] opinion").

Even so, "an adverse credibility finding must be sup-
ported by specific and cogent reasons, and the judge must
consider explanations offered for gaps and inconsistencies."
*Santashbekov*, 834 F.3d at 838–39 (denying review); see also *Yan
Lin v. Holder*, 656 F.3d 605, 606, 608 (7th Cir. 2011) (granting
review) (court must defer to agency's adverse credibility find-
ing if it is "supported by specific, cogent reasons that bear a
legitimate nexus to the finding") (citation omitted).

In *Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007), we
granted a petition for review where the immigration judge
"failed to distinguish between material lies, on the one hand,
and innocent mistakes, trivial inconsistencies, and harmless
exaggerations, on the other hand." We observed that in a case
in which the "basis for the evaluation of the witness's credi-
bility is set forth in detail by the trier of fact and has nothing
to do with demeanor but consists instead of inconsistencies or
falsehoods in the witness's testimony," the reviewing court
has "more than suspicion to work with in deciding whether
the determination of credibility was reasonable." *Id.* at 819.
We cited *Dong Gao v. BIA*, where the Second Circuit granted
the petition and observed:

> Although the substantial evidence standard
> leaves fact-finding to the agency, "it does not
> permit an appellate court to defer to unreasoned
> rulings, or those based on legal error, faulty
> analysis, or misreadings of the record." … Cred-
> ibility determinations that are based on the [im-
> migration judge's] analysis of testimony, as op-
> posed to demeanor, are granted less deference.

482 F.3d 122, 127 (2d Cir. 2007) (citations omitted); see also *id.*
("Notably, when the outcome of an asylum application 'rises

and falls purely on an [immigration judge's] credibility finding, courts have been particularly concerned that the decision-maker carefully detail the reasoning leading to the adverse finding.'") (citation omitted).[3]

B.  *Adverse Credibility Determination*

1.  *Cojocari's Testimony*

The immigration judge found both that Cojocari's testimony was not credible and that he failed to provide sufficient documentary evidence to corroborate his testimony. The Board discerned "no error in the Immigration Judge's adverse credibility finding" and agreed with the judge that the "documentary evidence submitted by [Cojocari] was insufficient to rehabilitate his incredible testimony." Yet of the various "inconsistencies" cited by the immigration judge, most are so trivial or benign that they cast no reasonable suspicion on the substance of Cojocari's testimony. Others are not true inconsistencies at all.

For instance, the immigration judge criticized Cojocari for mixing up a few dates. Cojocari testified that he was released from the hospital following his June 2007 arrest on July 2,

---

[3] Both *Kadia* and *Dong Gao* analyzed asylum claims filed before the REAL ID Act took effect, but nothing about the Act abrogated the guidance we draw from them. On the contrary, *Kadia* observed that while the REAL ID Act (if it applied) would permit the immigration judge to "consider inaccuracies or falsehoods that do not go to the heart of the asylum applicant's claim," the judge can do so "only as part of his consideration of 'the totality of the circumstances, and all relevant factors.'" 501 F.3d at 822; see also *Chun Sui Yuan*, 827 F.3d at 653 (under REAL ID Act, agency "still must distinguish between inconsistencies that are material and those that are trivial," and "reasonable explanations for discrepancies must be considered").

2007. However, he acknowledged that his personal declaration, which he submitted to immigration authorities at some point after he filed his asylum application and affidavit, stated incorrectly that he was released on July 7. He said he thought his attorney had "taken care of" the mistake. Regarding his medical treatment immediately before departing for the United States, Cojocari testified that he remained in the hospital until November 6, 2009, a date consistent with the hospital records that he provided. Yet after the government confronted him with his passport showing that he had entered Ukraine one day earlier, Cojocari acknowledged that he must have left the hospital on November 5.

We have remanded immigration decisions that placed outsized importance on an applicant's uncertainty about dates and times, the sorts of minor details that are most vulnerable to the vagaries of human memory. E.g., *Ferreira*, 831 F.3d at 811 (under REAL ID Act, remanding where adverse credibility determination rested in part on trivial discrepancy in petitioner's description about timing of assault); *Tandia v. Gonzales*, 487 F.3d 1048, 1052–53 (7th Cir. 2007) (under pre–REAL ID framework, remanding where adverse credibility determination rested on "insignificant details" such as dates); *San Kai Kwok v. Gonzales*, 455 F.3d 766, 769–70 (7th Cir. 2006) (under pre–REAL ID framework, remanding where adverse credibility determination rested on "minor discrepancies that are easily explained" and on "speculation or conjecture") (citations omitted).

Other circuits have likewise rejected adverse credibility determinations resting on trivial inconsistencies or mistakes about minor details such as dates. E.g., *Marouf v. Lynch*, 811

F.3d 174, 185 (6th Cir. 2016) ("In the context of a largely consistent account of persecution, reference to an incorrect date is not sufficient basis for discrediting an applicant's account. An inability to accurately recall the date when a traumatic event occurred is not particularly probative of a witness's credibility when alleging traumatic persecution, because such traumatic persecution itself may cause the witness difficulty in recalling details of the incident.") (citations omitted); *Ilunga v. Holder*, 777 F.3d 199, 207 (4th Cir. 2015) ("The totality of the circumstances standard … provides an [immigration judge] with ample discretion in assessing credibility. It does not, however, permit a judge to 'cherry pick' facts or inconsistencies to support an adverse credibility finding that is unsupported by the record as a whole."); *Wenxing Su v. Holder*, 570 F. App'x 96, 99 (2d Cir. 2014) (remanding where immigration judge relied on, among other things "immaterial omissions" in letter from petitioner's wife and criticized petitioner for failing to "specifically document or precisely remember one employer during a period of transitory work"); *Ai Jun Zhi v. Holder*, 751 F.3d 1088, 1092 (9th Cir. 2014) (remanding where immigration judge based adverse decision principally on "utterly trivial" discrepancy in dates) (citation omitted); *Qiuyun Zheng v. Holder*, 530 F. App'x 87, 88–89 (2d Cir. 2013) (remanding where immigration judge based adverse decision in part on "one- and two-day inconsistencies," which petitioner "promptly corrected").[4]

---

[4] Cf. *Yaogang Ren v. Holder*, 648 F.3d 1079, 1086 (9th Cir. 2011) (denying petition but explaining that although the REAL ID Act "gives immigration judges the power to consider any inconsistency in evaluating an applicant's credibility, the power to consider any inconsistency 'is quite distinct from the issue of whether the inconsistencies cited support an adverse

Cojocari's uncertainty about his dates of hospital discharge has little bearing on the reliability of his broader narrative. There seem to be no real doubts about whether Cojocari actually received the treatment he described.

In a similar vein, Cojocari initially testified that after his April 2009 arrest and detention, he and his wife Veronica had stayed with his in-laws in Gura Galbenei for about a month and a half. The immigration judge confronted him with his affidavit accompanying his asylum application, which said that he lived with his in-laws for two to three months. Cojocari acknowledged the discrepancy, then suggested he may have stayed with his in-laws for about two and a half months. We do not see how Cojocari's imperfect recall about the length of his stay in the Moldovan countryside—several years before his immigration hearings—is a reliable indicator of the truthfulness of his testimony about persecution for his political activities.

The immigration judge also found great significance in small variations in Cojocari's descriptions of the abuse he suffered at the hands of Moldovan authorities. Regarding the first beating on June 23, 2007, Cojocari testified that a detective's assistant struck him with a baton. He had not mentioned this particular detail in his written statements. He did write, however, that a group of men beat him and other detainees with batons, and a medical certificate confirms that he suffered "injuries caused by traumatic action with blunt objects."

---

credibility determination.' … As we have repeatedly held, 'minor discrepancies in dates that … cannot be viewed as attempts by the applicant to enhance his claims of persecution have no bearing on credibility.'") (citations omitted).

Similarly, in describing his August 28, 2009 interrogation, Co-jocari testified that a detective struck his hand with a baton. In his written statements he indicated more generally that police struck him with their fists, feet, and batons, without specifying that his hand was struck with the baton. Once again, a medical certificate confirms that Cojocari suffered injuries consistent with a beating: a closed fracture in his arm and multiple bruises.

The immigration judge was greatly troubled by the slightly greater specificity in Cojocari's live testimony. Yet it is perfectly ordinary that an asylum applicant, like virtually any other witness, will summarize his experience in writing and provide additional detail in face-to-face testimony in a hearing stage. The judge's approach to this case would require applicants to make sure that each written account of their personal histories is exhaustive, on pain of being disbelieved and returned to their home countries of persecution.

We doubt that busy immigration officials charged with reviewing asylum applications and attachments would welcome such an onerous rule, and we decline to endorse it. See *Chun Sui Yuan*, 827 F.3d at 654–55 (remanding where adverse credibility determination rested in part on slight inconsistencies between petitioner's statements and medical report that could have been explained by the impact of petitioner's injuries, his lack of sophistication, or translation errors) ("That greater detail is provided in live testimony than was included in an asylum application is not a reason to reject a petitioner's testimony as not credible."); see also *Tarraf*, 495 F.3d at 532 ("We … have noted that the failure to mention, in an asylum

application, certain details that later appear in live testimony does not render an alien's testimony per se incredible.").[5]

The immigration judge also cited an apparent inconsistency between two translated medical certificates relating to Cojocari's October 2009 treatment. A certificate that Cojocari submitted with his asylum application said that he suffered a dislocated right shoulder and bruises on his right arm. Another certificate said that Cojocari suffered a closed fracture of the "radial bone" in his right arm along with "multiple hematomas" (i.e., bruises).

The difference between these descriptions seems too slender a reed on which to rest an adverse credibility finding. For all we know, the discrepancy may be attributable to translation errors. The two certificates were translated from handwritten physicians' records by different translators at different times. Cojocari certainly cannot be faulted for any mistakes in translation. See *Kueviakoe v. U.S. Attorney General*, 567 F.3d 1301, 1305 (11th Cir. 2009) (rejecting as "wholly immaterial" a discrepancy between petitioner's live testimony about a "car" and his written statement about a "truck," where petitioner's words were translated, "suggesting that he was not the one making the word choice"). Moreover, a third certificate—prepared by the same translator who had noted Cojocari's closed fracture—said that he suffered a dislocated right shoulder in October 2009. During his hearings, Cojocari repeatedly testified that he suffered a shoulder injury, and

---

[5] To support its decision dismissing Cojocari's appeal, the Board specifically noted that Cojocari did not include in his written statements the fact that he was struck *on the hand* with a baton during his August 2009 interrogation. We do not understand the agency's preoccupation with this detail.

neither the judge nor the government confronted him about the possible inconsistency between two of the medical certificates. There is no reason to believe that Cojocari fabricated either of these documents. The immigration judge made no finding that the medical certificates were falsified in any way.

The perceived discrepancies we have just summarized are not adequate to support the agency's adverse credibility finding. However, two aspects of Cojocari's case (both of which the Board cited) give us pause.

First, Cojocari has offered some shifting explanations concerning his enrollment at the Academy of Economic Studies. In his asylum application, he said that he attended the academy through May 2009. In his declaration, he wrote that he was arrested on August 28, 2009 while "coming home from school." At his initial hearing, Cojocari testified (consistent with his declaration) that he had "just finished [his] classes at the academy" on August 28 when he was arrested. Later in the hearing, however, he said that he had last attended classes in February 2009, that his reference to May in the application was a mistake, and that he had dropped by the academy in August to collect a document showing that he was on academic leave. That seems straightforward enough—except that the document, which Cojocari offered into evidence, is dated October 16, 2009. When the judge confronted Cojocari about the inconsistent dates, he had "no explanation for this."

In his second hearing, with the help of new counsel, Cojocari offered an explanation: (1) he last studied at the academy in February; (2) he went on academic leave in May; (3) he requested a certificate in August and was given a receipt for

his request; and (4) he finally obtained the certificate in October. Perhaps so, but the immigration judge could reasonably have viewed this evolving narrative with some suspicion.

Second, Cojocari has offered inconsistent accounts of his October 25, 2009 beating and medical treatment. In his affidavit accompanying his asylum application, Cojocari wrote that he returned home the day after his beating "with the help of [his] friends" and that he received medical care at home for ten days. In his declaration and during his first hearing, however, Cojocari said that it was his father-in-law who picked him up the morning of October 26. He also testified during his first hearing that he received inpatient treatment at the hospital. He had "no explanation" for his statement in his affidavit that he received treatment at home. But by his second hearing, Cojocari's story seemed to shift again, as he testified that he visited the hospital "every day that [he] was staying home."

A reasonable factfinder could perhaps conclude that Cojocari's varying accounts of his university enrollment status and his October 2009 medical care weigh against the credibility of his testimony about his persecution. A reasonable factfinder could also conclude that these discrepancies are not material indications about the reliability of his overall account of persecution for his political activity, which is the critical issue in his asylum application. There seems to be no dispute that, whatever Cojocari's reasons for visiting the academy on August 28, 2009, he was arrested there on that date. There is certainly no dispute that, whoever came to Cojocari's aid after his October 2009 beating, someone retrieved him and helped him secure medical attention. See *Chun Sui Yuan*, 827 F.3d at 654 (where petitioner stated in personal statement that police

took him to hospital but later testified that he traveled by ambulance, there was no "significant inconsistency" as there was "no disagreement by the government that [petitioner] was transported to the hospital by *someone*"). Nor, as discussed below, does there seem to be any reason to believe the hospital records concerning Cojocari's injuries and treatment were fabricated.

Even if the varying accounts of Cojocari's enrollment status and October 2009 medical care might have allowed a reasonable factfinder to discredit his detailed account of political persecution over a period of more than two years, we cannot deny relief on that theory. The actual credibility decision by the immigration judge emphasized many other trivial matters that do not have a plausible bearing on Cojocari's credibility. We have no confidence that the judge would have reached the same adverse decision if she had focused on the one or two details that might actually matter.

Even with the deference we owe to credibility findings, both before and after passage of the REAL ID Act we have remanded in cases where the immigration judge focused on trivial discrepancies or made other errors that called the judge's overall analysis into question, and we have done so even if the record contained some facts that might have supported an adverse credibility determination. See, e.g., *Hongting Liu v. Lynch*, 788 F.3d 737, 742 (7th Cir. 2015) (where substantial evidence did not support four of judge's five reasons for discounting petitioner's testimony, petitioner's inconsistent statements about timing of visa and passport applications were "not independently sufficient to support a general finding of incredibility"); *Kadia*, 501 F.3d at 821 (where various

inconsistencies could have led judge to conclude that petitioner lied, remand was still necessary because "judge made a number of mistakes, uncorrected by the Board," and reviewing court could not be confident that "had he not made those mistakes he still would have disbelieved the petitioner"); *Adekpe v. Gonzales*, 480 F.3d 525, 531–32 (7th Cir. 2007) (where majority of discrepancies on which judge relied were immaterial but two discrepancies were arguably important, remand was still necessary because adverse credibility determination "relied in such large part on unimportant and explicable discrepancies"); *Georgis v. Ashcroft*, 328 F.3d 962, 970 (7th Cir. 2003) (where five reasons underlying adverse credibility determination were either unsupported or based on incomplete or improperly excluded evidence, reviewing court did not "defer to [judge's] credibility determination on … remaining sixth ground alone").

As in other administrative law regimes like Social Security disability decisions, where the administrative law judge must build a "logical bridge from evidence to conclusion," *Brown v. Colvin*, 845 F.3d 247, 251 (7th Cir. 2016) (citation omitted), an immigration judge must base a credibility finding on "cogent reasons bearing a legitimate nexus to the finding," *Giday v. Gonzales*, 434 F.3d 543, 553 (7th Cir. 2006). The judge in this case did not base her decision on cogent reasons, so we cannot uphold her credibility determination.

### 2. *Corroborating Evidence*

Under the REAL ID Act, the immigration judge was entitled to request corroborating evidence from Cojocari even if she found him otherwise credible. 8 U.S.C. § 1158(b)(1)(B)(ii); *Silais*, 855 F.3d at 745. As noted, Cojocari supplied substantial supporting evidence, including medical certificates, arrest

records, letters from his attorney and family members, and an AMN membership card. The judge concluded that Cojocari "did not provide sufficient reliable evidence to meet his burden of proof to show that the central aspects of his claim are true." The Board agreed with the immigration judge, "for the reasons stated in her decision, that the documentary evidence … was insufficient to rehabilitate [Cojocari's] incredible testimony." We conclude, however, that the judge's refusal to credit this documentary evidence was based on arbitrary and capricious reasoning.

The judge first criticized Cojocari for submitting medical documentation "specifically in order to bolster his asylum claim." We do not understand this criticism. When he first applied for asylum, Cojocari had submitted a medical certificate detailing his October 2009 injuries. In advance of his first merits hearing in November 2013, he submitted additional certificates pertaining to his treatment following his June 2007 arrest and his 2009 arrests and abduction.

Cojocari, who submitted his initial asylum application *pro se*, testified that he had been concerned about filing a timely claim. He had asked his mother to forward him whatever documents she could readily obtain. Later, after he understood more fully the "needs of proof and documentation," Cojocari asked his mother to track down and send along additional records. Following his first hearing—when, as discussed above, the government cross-examined him about his November 2009 hospital discharge date—Cojocari obtained an additional record that said he was "under ambulatory treatment" until November 6, 2009 but had his last consultation on November 5, 2009. According to Cojocari's passport, he and Veronica departed Moldova (by bus) on November 5 for

Ukraine, and then flew from Ukraine to the United States on November 6.

We do not see why Cojocari should be penalized for complying with his burden under the REAL ID Act to provide corroborating evidence. Nor do we see any reason to distrust the documents that he submitted at various points while his case was pending. Though the government speculated at oral argument that Cojocari's medical records (and, for that matter, his arrest records) may have been fabricated, the immigration judge made no such finding. There is no specific evidence in the record to support any such finding. The government had questioned Cojocari's country expert, Professor Igor Kotler, about the ease of obtaining fake medical documents in Moldova, but Professor Kotler could not answer that question directly, and the government made no further attempt to disprove or even challenge the authenticity of the documents. In fact, when Cojocari's attorney offered to submit the original medical certificates (with envelopes) for the government's review, government counsel remarked, "I'm not a document expert."[6]

Next, the judge wrote that Cojocari's arrest records "are of reduced evidentiary value because they are contradicted by [his] testimony." Again, we do not understand this criticism.

---

[6] Though the immigration judge did not question the authenticity of the medical certificates Cojocari submitted, she said she was "perplexed" that Cojocari neglected to supplement those certificates with a copy of his personal medical book. The judge did not explain why the medical book (which apparently summarizes Cojocari's entire medical history and contains doctors' notes handwritten in Romanian script) was any better evidence, or more useful for present purposes, than the certificates that Cojocari produced. This subject may be explored on remand.

The arrest records confirm that Cojocari was detained in June 2007 and in April and August 2009, just as he testified. The records say that Cojocari was arrested not because of his political activities but because he committed such infractions as "insubordination to legal requests of a police officer" and striking a police officer during protests. Those conflicts offer little basis for disbelieving Cojocari. If he was in fact arrested for lawful reasons unrelated to his political opinion, such arrests would not support his application for asylum, of course. But the immigration judge did not explain whether she chose to credit the official accounts of Cojocari's police encounters over his description of those events, nor, if she did, the reason for her distrust of Cojocari's description.

It should come as no surprise that a police force known for corruption and abuse might not have described accurately the circumstances of a dissident's arrests and detentions. If the official records of police states are to be treated as gospel, we doubt many bona fide political asylum seekers could prove their claims. See *Zhen Nan Lin v. U.S. Dep't of Justice*, 459 F.3d 255, 269–70 (2d Cir. 2006) (treating Chinese consular report as "highly unreliable and therefore insufficient to satisfy the substantial evidence requirement" because report was "based on the opinions of Chinese government officials who appear to have powerful incentives to be less than candid on the subject of their government's persecution of political dissidents").

Finally, the immigration judge wrote that two letters by Cojocari's Moldovan attorney, which (the judge acknowledged) "concern the mistreatment [Cojocari] suffered during his April 2009 detention and do not contradict [his] testimony," are nevertheless insufficient supporting evidence be-

cause (1) the letters are dated as of October 2013 and (2) Cojocari did not supplement the letters with a copy of the complaint that his attorney filed with the general prosecutor's office. We see no reason to discount the attorney's letters simply because they were written for purposes of the hearing in the United States and not back at the time of the events described. And while a copy of Cojocari's complaint might have been useful, we have cautioned immigration judges to use the corroboration requirement reasonably and to refrain from "'could have–should have' speculation about what evidence the applicant could have brought in a text-book environment." *Balogun v. Ashcroft*, 374 F.3d 492, 502 (7th Cir. 2004). The attorney's letters reinforce Cojocari's claims. The attorney wrote that police "clearly abused their authority" and that an "actual attempt to cover-up the case of mistreatment of Vladimir Cojocari by police authorities occurred."

The immigration judge discounted Cojocari's supporting documentation for arbitrary reasons not based on substantial evidence. The agency on remand should take a fresh look at this documentation, in addition to Cojocari's testimony. We do not conclude now that the documentary evidence compels a decision in Cojocari's favor. But the agency should consider the evidence fairly, without resorting to "could have–should have" speculation." *Id.*

### 3. *Kotler's Testimony and Country Reports*

In addition to testifying about his personal experience with political persecution and supporting that testimony with documentary evidence, Cojocari offered the expert report and testimony of Professor Igor Kotler, an historian and visiting scholar at Rutgers University. Professor Kotler described Moldova's political system as unstable. He noted that Cojocari's

political party, AMN, the "last source of true democracy," ceased to exist as of April 2011. Although the country is not currently under Communist rule, Kotler wrote that "superficial changes" in government have had "practically no effect on the human rights situation." He added that corruption is "rampant" and has "deeply penetrated all spheres of the Moldova[n] society."

According to Kotler's report, Cojocari would likely face "persecution, including physical abuse, intimidation and arbitrary detention, on the account of his political opinion, if returned to Moldova." Kotler reiterated the point in his hearing testimony, predicting that Moldovan authorities would likely arrest and torture Cojocari because he is a "democratic person" who has lived in the United States. The government introduced no expert to rebut Kotler's testimony and offered little in the way of cross-examination.

The immigration judge recognized Kotler as an "expert witness on country conditions in Moldova," and she observed that "Kotler's opinion that the Moldovan government would torture [Cojocari] if he returned to Moldova is not purely speculative." Nevertheless, the judge concluded that while "Kotler's testimony was reliable, the documentary evidence does not support his assertions." By "documentary evidence," the judge was referring to the U.S. Department of State "Country Reports on Human Rights Practices" for 2012 and 2013.

As the judge acknowledged, however, those country reports warn of police brutality and "[i]mpunity for torture and inhuman or degrading treatment." Both reports describe government corruption as the "most significant human rights problem in the country." The 2012 report cites police torture

and mistreatment of detainees as a "second major area of concern," while the 2013 report states that police abuse remains a "serious problem" and that implementation of anti-torture measures has been "inconsistent." Both reports highlight the government's failure to hold officials accountable for abuses committed during the April 2009 crackdown on political demonstrations—the very crackdown that resulted in Cojocari's nine-day detention and subsequent flight to Gura Galbenei.

The immigration judge brushed aside these stark warnings in the country reports. She concluded that there was "no evidence in the record … that persons similarly situated to [Cojocari] will likely be tortured upon return to Moldova." But there was such evidence: Kotler's testimony and expert report, which the government failed to rebut and which the judge credited as reliable. The judge gave short shrift to this unrebutted evidence but offered no plausible explanation for doing so. On remand, the agency should take a close look at the record concerning the social and political situation in Moldova as it relates to Cojocari's claims. To that end, the agency should consider reopening the record to take account of more current data, such as the State Department's 2016 report (which, like the earlier reports, cites widespread corruption and allegations of torture and mistreatment by police as significant problems in the country).

III. *Conclusion*

We do not often see a timely asylum case where the applicant is a citizen of a country infamous for corruption and political oppression and presents a broadly consistent narrative and substantial corroboration. Yet Cojocari has done just that.

Granted, his testimony includes a handful of minor discrepancies, and a couple of these—notably the timeline involving his university enrollment and the details of his October 2009 hospitalization—might have supported a plausible adverse credibility finding. But most of the discrepancies on which the immigration judge relied are so trivial or illusory that we have no confidence in her analysis or in the Board's decision resting on that analysis.

Cojocari is entitled to a fresh look at his prior testimony and the evidence he supplied in support of his application for asylum, withholding of removal, and protection under the CAT. We therefore grant the petition for review. We urge the Board to assign this case to a different immigration judge for the remand proceedings. That is the best way to ensure that Cojocari gets the fair shake he deserves. E.g., *Castilho de Oliveira v. Holder*, 564 F.3d 892, 900 (7th Cir. 2009); *Tadesse v. Gonzales*, 492 F.3d 905, 912 (7th Cir. 2007); *Bace v. Ashcroft*, 352 F.3d 1133, 1141 (7th Cir. 2003); cf. Cir. R. 36 (7th Cir. 2016) (cases remanded for new trial are presumptively assigned to a different district judge).

On remand, the immigration judge should allow counsel for both sides to supplement the record if there is additional evidence (such as Cojocari's medical book or an updated report on the political landscape in Moldova) that would assist the judge in assessing the risk of persecution or torture that Cojocari would face if deported.

The petition for review is GRANTED, the decision of the Board of Immigration Appeals is VACATED, and the case is REMANDED to the Board for further proceedings consistent with this opinion.