In the

# United States Court of Appeals

## For the Seventh Circuit

No. 21-1315

SHUANG DAI,

*Petitioner*,

*v.*

MERRICK B. GARLAND, Attorney
General of the United States,

*Respondent*.

Petition for Review of an Order of the
Board of Immigration Appeals.
No. A201-054-344

ARGUED OCTOBER 28, 2021 — DECIDED JANUARY 24, 2022

Before RIPPLE, HAMILTON, and SCUDDER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Shuang Dai, a Chinese citizen, was
admitted to the United States on a student visa on December
18, 2010. She later applied for asylum, withholding of re-
moval, and protection under the Convention Against Torture
("CAT") on the basis of religious persecution. Following a
merits hearing, an immigration judge ("IJ") denied relief,
finding that Ms. Dai was not credible and that the evidence

she produced in support of her application failed to establish past persecution or a well-founded fear of future persecution. The Board of Immigration Appeals ("BIA") affirmed without opinion, and Ms. Dai filed a petition for review. Because the IJ's decision is supported by substantial evidence, we deny the petition.

# I

# BACKGROUND

## A.

In Ms. Dai's written asylum application, she set forth the following factual basis for her claim. In July 2009, while Ms. Dai was away from home, her grandmother was hit by a motorcycle. When Ms. Dai went to the hospital to visit her, she met "Aunt Wang,"[1] her grandmother's neighbor, who was taking care of her grandmother. According to Ms. Dai, Aunt Wang told her stories from the Bible and prayed with her. After that encounter, she began to participate in gatherings with Aunt Wang's church members. She stated that she was formally baptized and became a Christian on April 18, 2010.

On November 7, 2010, while the church members were gathered in Ms. Dai's home, police broke in, confiscated the Bibles and other religious material, and took all of the church members to the police station. The police separated the congregants into different rooms, and two police officers interrogated Ms. Dai. They "ordered [her] to admit that [the group] carried out activities against the Party and the Government,"

---

[1] A.R. 187. Ms. Dai refers to "Aunt Wang" in her written asylum application, but "Auntie Wong" in her hearing testimony.

but Ms. Dai only would admit to being a Christian.[2] According to Ms. Dai, "[t]he police became very angry and grasped [her] hair and banged [her] head on the wall and ordered [her] to confess."[3] At this point, her nose was bleeding, but the police ignored it. They then "ordered [her] to kneel down on the ground and criticize [her]self."[4] They further ordered her to give the names of her fellow churchgoers; when she responded that she did not know who they were, the police "kept slapping [her] on [her] face."[5] Ms. Dai "felt dizzy and fell down on the ground," at which point her interrogators "kicked [her] hard."[6] After this encounter, she was placed in a detention room for five days with little food and water. She was released after her family paid a fine and after she signed a statement promising not to participate in religious activities and to report to the police on a regular basis.

**B.**

Ms. Dai next had an interview with an asylum officer. The officer concluded that Ms. Dai was not credible for several reasons. First, Ms. Dai's statements about her religious practices were inconsistent. She gave varying dates for when she started attending church and, when asked to explain the discrepancy, she "was non-responsive and continued to

---

[2] *Id.* at 189.

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *Id.*

contradict herself."[7] Second, Ms. Dai was unable to provide details as to what occurred during the church meetings she attended. Nor was she able to recount in detail the Bible stories that Aunt Wang had shared with her and the Bible passages she had read and studied. Third, Ms. Dai was unable to describe her encounter with the police in any detail. The asylum officer, therefore, denied Ms. Dai's application. Ms. Dai's case was referred to an IJ.

## C.

At a merits hearing held on April 16, 2018, Ms. Dai offered the following testimony. She explained that she came to the United States to attend school but could not afford to do so. She did not return to China because she had been "arrested by the communist party and then … was beaten up" for "attend[ing] [an] underground family gathering church."[8] She further testified that she started "practic[ing] the Christian religion" in July 2009 when "Auntie Wong" "shared the Gospel" with her.[9]

Turning to the events of November 7, 2010, she testified that the police "rush[ed] in" to a church meeting at her house.[10] The police ordered everyone against the wall and searched her home. According to Ms. Dai, the police took everyone to the station, except her grandmother, who "ha[d]

---

[7] *Id.* at 133.

[8] *Id.* at 85.

[9] *Id.* at 86.

[10] *Id.* at 90.

issues with her legs."[11] Ms. Dai testified that, once at the station, two police officers interrogated her, "insulted [her], yelled at [her], and then beat [her] up."[12] The police asked her why she was using Christianity "to do something against the government and the party"; they also asked her for the names of the group's members and the source of their religious material.[13] According to Ms. Dai, when she would not reveal the names of her fellow members, "the police were very upset," "[g]rabbed her hair[,] and banged [her] head against the wall."[14] She said that she "was injured" during the interrogation and then spent five days in detention.[15]

She was released when her mother, who had been contacted by the police, paid a fine. Following her release, she did not seek treatment for her injuries because she had been warned by the police not to go to a hospital; instead, her mother brought topical medication for her to use. As instructed, Ms. Dai reported to the police station four times. She did not meet with church members again before leaving for the United States on a student visa in December 2010.

Ms. Dai further testified that, when she arrived in the United States, she attended church in Los Angeles and was

---

[11] *Id*. at 93.

[12] *Id*. at 95.

[13] *Id.*

[14] *Id*. at 97.

[15] *Id.*

baptized there. Upon moving to Chicago, she attended the Chinese Union Church once a week.

Upon further questioning by the Government's counsel, Ms. Dai initially stated that her grandmother had attended church services with her.[16] However, Ms. Dai later changed her testimony and stated that, given her grandmother's leg injury, her grandmother did not attend services with her.[17] In response to questions about the type of injuries she suffered at the hands of the police, she stated that her "body [was] bruised," and there was "swelling."[18] Ms. Dai also acknowledged that she had applied for her student visa before the incident with the police; she stated that she wanted a visa "[b]ecause U.S. is more freedom, more religious freedom country" and that she "want[ed] to come here to attend school."[19] Ms. Dai admitted that, since she had left China, her parents had not been harmed. When questioned regarding why her fellow churchgoers in Chicago had not testified or submitted statements on her behalf, she responded that she did not ask them to attend her hearing because she did not know them well enough.

In addition to her testimony, Ms. Dai submitted a letter from her mother in support of her application. The letter stated that the police had come to her parents' house several

---

[16] *See id.* at 109–10.

[17] *See id.* at 111–12.

[18] *Id.* at 115.

[19] *Id.* at 118. Ms. Dai had begun the process of applying for the visa on September 12, 2010.

times looking for her, but that they had not "ma[d]e it too dif-ficult" for her parents.[20] The letter warned that Ms. Dai "should not come back though!"[21]

### D.

Following the hearing, the IJ took the case under advise-ment and later issued a written decision. In her decision, the IJ recounted Ms. Dai's testimony and concluded that it "was internally inconsistent and inconsistent with other evidence in the record, including with the notes from the respondent's asylum interview."[22] The IJ also noted that there were "omis-sions in her testimony," that it "was often vague," and that she "failed to explain discrepancies."[23]

The IJ then identified the material inconsistences between Ms. Dai's testimony and her former statements as well as in-ternal inconsistencies in her hearing testimony. First, Ms. Dai had given different dates on which she had started attending church services. At the hearing, Ms. Dai testified that she had begun attending church in July 2009. However, in her inter-view with the asylum officer, she first stated that she had at-tended only one gathering prior to her November 2010 arrest, but later stated that she began attending weekly gatherings in September 2009. The IJ also noted that Ms. Dai had not been consistent in her testimony regarding her grandmother at-tending church services with her. Finally, the IJ found the

---

[20] *Id*. at 135.

[21] *Id.*

[22] *Id.* at 54.

[23] *Id.*

description of her encounter with the police inconsistent and lacking important details. In both her declaration in support of her asylum application and her hearing testimony, she had said that the police grabbed her by the hair and hit her head against the wall; however, in her declaration in support of her asylum application, she also had stated that the police forced her to kneel, slapped her repeatedly, and kicked her after she had fallen to the floor. The nature of her injuries differed as well. In her asylum declaration, she recounted that she had suffered a bloody nose and had become dizzy. However, in her testimony she said only that she was bruised and swollen. The IJ noted that "the respondent was asked both during direct and cross-examination to explain the assault and extent of her injuries, but [had] failed to provide details consistent with her written declaration."[24] "In sum," the IJ concluded,

> the respondent's testimony was internally in-
> consistent and inconsistent with other evidence
> in the record, including with the notes from the
> respondent's asylum interview. The court addi-
> tionally note[d] certain omissions in her testi-
> mony. Moreover her testimony was often vague
> and failed to explain discrepancies. While the
> court acknowledge[d] that each of these find-
> ings alone might [have been] insufficient to war-
> rant an adverse credibility finding, the court
> [wa]s concerned with the cumulative effect of
> these inconsistencies.[25]

---

[24] *Id*. at 55.

[25] *Id*.

The IJ also determined that there was a lack of corroboration regarding the "harm she allegedly suffered in China based on her religious practice, or her continued practice of her religion in Chicago."[26] Specifically, the letter from Ms. Dai's mother did not mention the harm Ms. Dai previously had suffered. Ms. Dai had not submitted letters of support from members of her church or Auntie Wong, nor were there letters from her fellow churchgoers in Chicago corroborating her attendance and participation. Consequently, the IJ denied relief.

The BIA affirmed the IJ's decision without a separate opinion, and Ms. Dai filed a timely petition for review.

## II

## DISCUSSION

Where, as here, the BIA affirms the IJ's decision without opinion, we review the IJ's analysis "under the highly deferential substantial evidence test." *See Balogun v. Ashcroft*, 374 F.3d 492, 498 (7th Cir. 2004).[27] Under this standard, "we must uphold the IJ's findings if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole; we may reverse the IJ's determinations only if we determine that the evidence *compels* a different result." *Id.*

---

[26] *Id.* at 56.

[27] In her brief, Ms. Dai asks us to review both the decision of the BIA and the IJ. However, the BIA clearly affirmed the IJ's opinion without an opinion of its own. *See id*. at 3. Consequently, the operative agency decision is that of the IJ.

The burden of proof is on the applicant to establish that she qualifies for asylum. *See Cojocari v. Sessions*, 863 F.3d 616, 620 (7th Cir. 2017) (citing 8 U.S.C. § 1158(b)(1)(B)(i)). To be eligible for asylum, an applicant must "demonstrat[e] that [s]he is 'unable or unwilling to return' to the country of h[er] nationality 'because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.'" *Orellana-Arias v. Sessions*, 865 F.3d 476, 484 (7th Cir. 2017) (quoting 8 U.S.C. § 1101(a)(42)(A)).[28] "In some cases, the applicant may carry the burden through testimony alone, but only if the immigration judge finds the testimony credible and persuasive." *Cojocari*, 863 F.3d at 620 (citing 8 U.S.C. § 1158(b)(1)(B)(ii)). Thus, asylum cases "often turn on the IJ's credibility determination; an adverse credibility determination will doom the applicant's claimed eligibility." *Alvarenga-Flores v. Sessions*, 901 F.3d 922, 925 (7th Cir. 2018) (quoting *Musollari v. Mukasey*, 545 F.3d 505, 508–09 (7th Cir. 2008)).

An IJ's "credibility determination assesses the claim for consistency, detail, and the inherent plausibility of the applicant's account." *Id.* (citing 8 U.S.C. § 1158(b)(1)(B)(iii)). Because Ms. Dai's case is governed by the REAL ID Act, the IJ

---

[28] For withholding of removal, the applicant "must establish a clear probability that his life or freedom will be threatened upon his return to his country." *Lozano-Zuniga v. Lynch*, 832 F.3d 822, 826–27 (7th Cir. 2016). For relief under the CAT, "the applicant must show 'that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.'" *Id.* at 830 (quoting *Sarhan v. Holder*, 658 F.3d 649, 653 (7th Cir. 2011)). Because an "asylum claim ha[s] the lowest burden of proof," an applicant's "failure to establish eligibility for asylum necessarily means that she cannot prevail on her withholding of removal and CAT claims." *N.Y.C.C. v. Barr*, 930 F.3d 884, 890 (7th Cir. 2019).

"may base an adverse credibility finding on any inconsistencies or falsehoods in the applicant's testimony, without regard to whether such inconsistencies or falsehoods go to the 'heart of the applicant's claim.'" *Cojocari*, 863 F.3d at 620 (quoting 8 U.S.C. § 1158(b)(1)(B)(iii)). Nevertheless, the IJ must "distinguish between inconsistencies … that are material and those that are not." *Krishnapillai v. Holder*, 563 F.3d 606, 617 (7th Cir. 2009). Our review of an IJ's credibility determination "is highly deferential" and will be disturbed "[o]nly in extraordinary circumstances." *Omowole v. Garland*, 6 F.4th 734, 742 (7th Cir. 2021). Even if the IJ determines that an applicant is credible, she may still require corroborative evidence "unless the applicant does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii).

In Ms. Dai's case, the central issue is whether the IJ's conclusion that Ms. Dai was not credible is supported by substantial evidence. Ms. Dai acknowledges that there are some differences and discrepancies among (and within) her asylum application, her statements to the asylum officer, and her testimony at the merits hearing. Nevertheless, she maintains that these discrepancies are either reconcilable or so trivial that they cannot support an adverse credibility determination.

Ms. Dai maintains that the first discrepancy identified by the IJ—how long she had been practicing her faith—is illusory. She states:

> [T]he Petitioner ultimately stated during her asylum interview that she had attended weekly gatherings since September of 2009. The Petitioner testified that she learned about Christianity from her next door neighbor in July 2009 and

> attended her first gathering. However, it is not inconsistent for Petitioner to attend her first gathering in July, and then subsequently attend weekly gatherings starting in September.[29]

Although Ms. Dai presents one way to reconcile the testimony, "[w]e will not overturn a credibility determination 'simply because the evidence might support an alternate finding.'" *Tawuo v. Lynch*, 799 F.3d 725, 728 (7th Cir. 2015) (quoting *Xiao v. Mukasey*, 547 F.3d 712, 717 (7th Cir. 2008)). Instead, "[w]e need only assure ourselves that the IJ … provided specific reasons based on the evidence for [he]r credibility determinations." *Id.* at 728–29.

Here, the evidence in the record supports the IJ's conclusion that the date on which Ms. Dai began to attend underground church services was a moving target. Ms. Dai testified that she "start[ed] to practice the Christian religion" and attended her first service in July of 2009.[30] She also stated that "whenever there [wa]s a gathering," she would go.[31] This account is different from her testimony before the asylum officer in which she stated, initially, that she only had attended one meeting prior to her arrest in 2010, and later that she began attending weekly meetings in September 2009.

Additionally, as the Government notes, it was not simply the differences in Ms. Dai's testimony between the interview and the merits hearing that was troubling. Rather, during her

---

[29] Petitioner's Br. 12 (internal citations omitted).

[30] *See* A.R. 86, 108.

[31] *Id.* at 109.

interview with the asylum officer, she first stated that she had attended only one church meeting prior to her arrest, but then stated that she started attending meetings in September 2009.[32] Moreover, "[w]hen asked to explain the inconsistency, [Ms. Dai] was non-responsive and continued to contradict herself."[33] Thus, the record supports the IJ's determination that there were discrepancies regarding how long Ms. Dai had been practicing her faith before the incident with the police.

Concerning the second discrepancy—whether her grandmother attended church services with her—Ms. Dai acknowledges that she gave conflicting testimony.[34] Her counsel suggests that "[w]e cannot speculate as to why the Petitioner initially answered incorrectly" and maintains that whether Ms. Dai's grandmother attended church with her is trivial.[35] However, certainly one reasonable conclusion from Ms. Dai's different recollections is that she is prevaricating. Moreover, the IJ acknowledged that each of the inconsistencies, standing alone, "might be insufficient to warrant an adverse credibility finding," but was "concerned with [their] cumulative effect."[36]

---

[32] *See* Petitioner's Br. 12 (noting that Ms. Dai "ultimately stated during her asylum interview that she had attended weekly gatherings since September of 2009").

[33] A.R. 133.

[34] *See* Petitioner's Br. 13.

[35] *Id.*

[36] A.R. 55

Finally, the IJ was concerned by "inconsistencies and omissions" in the descriptions of Ms. Dai's encounters with the police.[37] Specifically, in her written asylum application, Ms. Dai not only stated that the police grabbed her by the hair and hit her head against the wall, but she also explained that she was "instructed to kneel, slapped, and kicked by the officers," "that her nose bled, … that she felt dizzy," and that she "fell to the ground after the beating."[38] However, at the merits hearing she testified only that the police grabbed her by the hair and banged her head against the wall. Her resulting injuries were that she was "bruised and swollen."[39]

Again, Ms. Dai at least tacitly acknowledges that her testimony at the hearing differed from her prior statement: "The Petitioner not including the gory details of her traumatic physical abuse in her testimony should not be used as the basis of an adverse credibility determination."[40] However, the severity of Ms. Dai's abuse was critical to establishing her persecution claim. We have explained that persecution requires "the use of *significant* physical force against a person's body … or nonphysical harm of equal gravity." *Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011). Even one attack may constitute persecution, but the force used or the resulting harm must reflect severe abuse. Moreover, especially where there is no corroboration, the alien must supply the specifics about

---

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] Petitioner's Br. 13–14.

the force used or injuries sustained because "it is the details that reveal the severity of the particular situation." *Liu v. Ashcroft*, 380 F.3d 307, 313 (7th Cir. 2004).

The testimony that Ms. Dai gave at her merits hearing regarding her encounter with the police differed both in severity (and resulting injury) from the encounter she described in her asylum application. The IJ accurately identified the differences in Ms. Dai's recitation of events. At her merits hearing, where she was represented by counsel, Ms. Dai stated only that the police "[g]rabbed her hair and banged [her] head against the wall."[41] Her resulting injuries were bruising and swelling. However, in her asylum application, she described a more violent encounter: police not only grabbed her by the hair and banged her head against the wall, but "kept slapping … [her] face."[42] She was bleeding, "felt dizzy[,] and fell down to the ground," at which point her interrogators "kicked [her] hard."[43] That Ms. Dai left out these important details raises additional questions concerning Ms. Dai's credibility and further supports the IJ's conclusion.

Moreover, the IJ found that Ms. Dai had not "adequately corroborate[d] her claim, and, therefore, her credibility ha[d] not been rehabilitated with documentary evidence."[44] As we already have noted, even if the IJ had determined that Ms. Dai was credible, the IJ still could have required corroborative

---

[41] A.R. 97.

[42] *Id.* at 189.

[43] *Id.*

[44] *Id.* at 56.

evidence "unless the applicant d[id] not have the evidence and [could not] reasonably [have] obtain[ed] the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii). Here Ms. Dai maintains that she could not reasonably have obtained any corroborating evidence. According to Ms. Dai, she could not have provided corroborative evidence of her injuries because the police had warned her against going to the hospital. Additionally, she could not have provided corroborative evidence that she practiced her faith in China because other churchgoers are being watched by the Chinese government.

The IJ, however, did not fault Ms. Dai for failing to provide hospital records. The IJ explicitly acknowledged that there would not be hospital records related to Ms. Dai's injuries.[45] Nevertheless, the IJ believed that Ms. Dai's mother, who had submitted a letter in support of her asylum application, could have provided corroborating evidence regarding Ms. Dai's "arrest, interrogation, or injuries," but her mother was silent as to those matters.[46] Moreover, the IJ noted that there was no evidence in the record to corroborate that Ms. Dai had continued to practice her faith after her move to Chicago in 2014.

Thus, the record supports the IJ's conclusion that Ms. Dai did not shoulder her burden of establishing her eligibility for

---

[45] *See id.*

[46] *Id.* Although it is less reasonable to expect that Ms. Dai could have obtained corroborating documentation from her fellow churchgoers, who may have been under the watchful eye of the local police, the IJ was clear that more detailed information from Ms. Dai's parents would have sufficed. *See id.* ("She also failed to supply affidavits or sworn statements from her parents. She does not contend that she was unable to contact her family to request affidavits or other documents.").

asylum[47] given the discrepancies in her testimony and the lack of corroborative evidence.

## Conclusion

For the foregoing reasons, Ms. Dai's petition for review of the decision of the BIA is denied.

PETITION DENIED

---

[47] Because Ms. Dai did not establish her eligibility for asylum, she cannot meet the higher burden for withholding of removal. *See supra* note 28. Ms. Dai did not make any argument before this court regarding relief under the CAT; she therefore has forfeited any argument regarding that relief. *See Silais v. Sessions*, 855 F.3d 736, 742 n.5 (7th Cir. 2017).